FILED

2014 OCT 21  A 11: 17

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ROBERT ARCURI and<br>LARRY DOSIK, | )<br>)<br>) | |
| Plaintiffs, | ) | |
| v. | )<br>) | Civil Action No. 1:14-cv-1375<br>(CMH/TRJ) |
| PASSPORT AUTOMOTIVE GROUP, INC.,<br>PASSPORT MOTORCARS, INC. D/B/A<br>PASSPORT INFINITI OF ALEXANDRIA and<br>PASSPORT NISSAN OF ALEXANDRIA,<br>EVERETT HELLMUTH, BRUCE DUNNIGAN,<br>and ANTHONY SCHIFANO,<br>Serve: Registered Agent<br>      Richard V.W. Adams, III<br>      1925 Isaac Newton Square, Suite 250<br>      Reston, Virginia  20190 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | JURY TRIAL DEMANDED |
| Defendants. | )<br>) | |

## COMPLAINT

Plaintiffs Robert Arcuri ("Arcuri") and Larry Dosik ("Dosik") (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby file this Complaint against Defendants Passport Automotive Group, Inc. ("Passport Automotive"), Passport Motorcars, Inc. ("Passport Motorcars") d/b/a Passport Infiniti of Alexandria ("Passport Infiniti") and Passport Nissan of Alexandria ("Passport Nissan"), Everett Hellmuth ("Helmuth"), Bruce Dunnigan ("Dunnigan"), and Anthony Schifano ("Schifano") (collectively, "Defendants"), and in support thereof allege as follows:

### NATURE OF THIS ACTION

1.     This action involves federal statutory and state common law claims by two (2) veteran automotive industry professionals who were retaliated against and, ultimately, terminated

1

in violation of 42 U.S.C. § 1981 ("Section 1981") and Virginia public policy because they opposed their employer's discriminatory and illegal business practices. When Plaintiffs Arcuri and Dosik discovered Passport Infiniti's new General Manager, Defendant Schifano, did not hire a job applicant solely because the individual wore a turban and was committing fraud by selling used cars that were not properly inspected or repaired as "certified pre-owned vehicles," they refused to participate in Schifano's fraudulent scheme and reported his discriminatory and illegal activities to Passport Infinity senior executives and owners, Defendants Dunnigan and Hellmuth. However, Dunnigan and Hellmuth merely defended Schifano's actions and in the days and months that followed Arcuri and Dosik were subjected to various forms of retaliation, which culminated in them being abruptly and summarily terminated less than three (3) weeks apart after having diligently worked for Passport Automotive dealerships a combined total of more than thirty (30) years. Through this action, Plaintiffs seek injunctive relief to prevent future acts of discrimination and retaliation by Defendants; compensatory damages, including, but not limited to, back pay for lost wages, salary, commissions, fringe benefits and any other remuneration Plaintiffs would have earned during the period of retaliation through trial, front pay, future pecuniary losses, and damages for emotional distress, pain and suffering, inconvenience, mental anguish, humiliation, disgrace, loss of dignity and loss of enjoyment of life; punitive damages; pre-judgment and post-judgment interest; attorney's fees, costs and expenses; and such other relief as the Court may deem proper.

## PARTIES

2. Plaintiff Robert Arcuri is an individual who resides at 18515 Perdido Bay Terrace, Leesburg, Virginia. Before Defendant Dunnigan notified Arcuri that his employment

was being terminated on or about August 1, 2014, Arcuri had been the General Sales Manager at Passport Infiniti for approximately four (4) years.

3. Plaintiff Larry Dosik is an individual who resides at 13857 Gullane Drive, Woodbridge, Virginia. Dosik worked for Passport Automotive dealerships for about twenty-four (24) years. He worked at Passport Nissan of Marlow Heights from 1990 until July 2008 when he was transferred to Passport Infiniti. Before Defendant Dunnigan notified Dosik that his employment was being terminated on or about July 10, 2014, Dosik had been the Service Director at Passport Infiniti for approximately six (6) years.

4. Defendant Passport Automotive Group, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 5000 Auth Way, Marlow Heights, Maryland. Passport Automotive is an automobile dealer group that operates at least ten (10) dealerships in the greater Washington, DC area, including, but not limited to, Passport Infiniti of Alexandria and Passport Nissan of Alexandria.

5. Defendant Passport Motorcars, Inc. is a corporation duly organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 150 S. Pickett Street, Alexandria, Virginia. Passport Motorcars is the official business entity name of Passport Infiniti and Passport Nissan.

6. Defendant Everett Hellmuth is and, at all relevant times herein, was Passport Automotive's President and oversaw all operational and corporate functions of some or all of Passport Automotive's dealerships, including Passport Infiniti and Passport Nissan. Upon information and belief, Hellmuth is the majority shareholder of Passport Automotive and Passport Motorcars. Hellmuth was a direct and substantial participant in the wrongful conduct alleged in this Complaint. At all times relevant herein, Hellmuth was acting both individually

and as an actual and/or apparent agent, servant and/or employee of Passport Automotive and Passport Motorcars.

7. Defendant Bruce Dunnigan is and, at all relevant times, was a Vice President at Passport Automotive and actively involved in the day-to-day management of some or all of Passport Automotive's dealerships, including Passport Infiniti and Passport Nissan. Upon information and belief, Dunnigan is a minority shareholder of Passport Motorcars. Dunnigan was a direct and substantial participant in the wrongful conduct alleged in this Complaint. At all times relevant herein, Dunnigan was acting both individually and as an actual and/or apparent agent, servant and/or employee of Passport Automotive and Passport Motorcars.

8. Defendant Anthony Schifano is and, at all relevant times, was Passport Nissan's General Manager. Schifano also served as Passport Infiniti's General Manager from September 2013 until December 2013 when his management responsibilities at Passport Infiniti were supposedly eliminated as a result of Arcuri and Dosik's complaints, and he resumed that role the day after Arcuri's employment was terminated in August 2014. Schifano was a direct and substantial participant in the wrongful conduct alleged in this Complaint. At all times relevant herein, Schifano was acting both individually and as an actual and/or apparent agent, servant and/or employee of Passport Motorcars.

## JURISDICTION AND VENUE

9. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' retaliation claims arise under and pursuant to Section 1981, which is a federal statute. The Court has supplemental jurisdiction over Plaintiffs' common law claims for wrongful discharge in violation of Virginia public policy pursuant to 28

U.S.C. § 1367 because Plaintiffs' state law claims grow out of the same nucleus of facts and are so related to the federal claims that they are part of the same case or controversy.

10. The Court has personal jurisdiction over Defendants because they work and are subject to service of process in Virginia.

11. Venue is proper in this District and Division because the wrongful acts giving rise to Plaintiffs' claims occurred at Passport Infinity in Alexandria, Virginia.

## FACTUAL ALLEGATIONS

12. Within weeks of Defendant Schifano becoming General Manager at Passport Infiniti in September 2013, Plaintiffs Arcuri and Dosik discovered that Schifano was engaging in discriminatory and illegal business practices.

13. In particular, in or around September 2013, Schifano (who is White) bragged to Arcuri that he and Dunnigan (who is also White) did not hire a job applicant who appeared to be East Asian or Middle Eastern that Schifano readily admitted was a strong candidate for the position of New Car Sales Manager at Passport Infiniti solely because the individual wore a turban. Arcuri had asked if Schifano and Dunnigan had any success finding someone for the position and Schifano replied that he and Dunnigan "were just laughing about that" and looking at a picture of the prospective hire on Schifano's cellular phone. Schifano said he and Dunnigan "had been talking to someone and they thought they had the right guy" until they "found out the guy had a handicap." He then said, "here let me show you," and displayed a picture of a man wearing a turban. Schifano rhetorically asked Arcuri, "could you imagine this f*cking guy working here in our showroom in a turban?" The man depicted in the picture was not hired for the New Car Sales Manager position at Passport Infiniti or any other position at Passport Automotive.

5

14. In addition, in or around November 2013, both Arcuri and Dosik learned that Schifano was committing several types of fraud.

15. More specifically, Arcuri heard from several other employees that Schifano was forging customer names on claim forms for a Customer Loyalty program that allowed the dealership to receive incentive payments and/or rebates of $1,000 to $2,500 from the manufacturer. To claim the incentive payments, the dealership was required to submit the original claim form with the customer's signature to the manufacturer. The manufacturer would not issue any incentive payments and/or rebates for claims the dealership submitted until the required documentation was provided. After looking into the matter, Arcuri confirmed that Schifano had forged customer signatures on at least five (5) claim forms.

16. Further, both Arcuri and Dosik realized Schifano was defrauding Passport Automotive customers by marketing and selling used vehicles that were not properly inspected, reconditioned or certified to meet the manufacturer's standards as certified pre-owned vehicles or "CPOs." Pursuant to the certified pre-owned program, used vehicles that have been inspected, refurbished and certified as complying with high standards established by the manufacturer are eligible for additional benefits, such as special financing and an extended warranty backed by the manufacturer. To qualify for certification, vehicles must undergo a 167-point inspection, which is performed by manufacturer-trained service technicians at the dealership. During the certification process, the service technicians complete an inspection checklist documenting that all 167 items have been inspected and each item either meets the manufacturer's standards or requires repairs. If the service technicians identify deficiencies, the recommended repairs must be done or the vehicle does not qualify for the certified pre-owned program. Importantly, the service technician, the Service Manager (who supervises the service technicians), and the Used

Car Sales Manager (who oversees the sale of CPOs) are all required to sign the checklist to certify that all covered items have been inspected and all repair and appearance standards have been met. Further, the customer must be given a copy of the inspection checklist and also signs the checklist to acknowledge that a copy was received.

17. However, Schifano refused to authorize numerous repairs that were necessary to bring vehicles up to the manufacturer's certification standards and repeatedly instructed Dosik to pressure the service technicians to eliminate recommended repairs and sign off on inspection checklists for vehicles that were never properly inspected or repaired. As Passport Infiniti's Service Director, Dosik directly supervised the service technicians and was responsible for signing the inspection checklists to certify that all repair standards had been met. Dosik pointed out that making the recommended repairs was a mandatory part of the certification process. However, Schifano responded that the "CPO is just a form and a rubber stamp" and said, "Don't worry. Nothing will come back on you."

18. When the service technicians continued to note deficiencies, Schifano threatened to retaliate against them, telling Dosik if they persisted he would "turn the place into a union shop" and "if a tech's shoelace was untied" Schifano would "send him home for a week." When Dosik advised Schifano that he was unwilling to sign off on inspection checklists for vehicles that were not properly inspected or repaired, Schifano basically threatened Dosik's job, stating, "If you can't do this, I'll find someone who can."

19. Arcuri initially realized that Schifano was perpetrating the fraudulent CPO scheme because as Passport Infiniti's General Sales Manager Arcuri was responsible for resolving any issues when used vehicles that were falsely marketed and sold as CPOs without undergoing the necessary repairs were returned for failing state inspections and other problems

and Arcuri noticed that the files for these transactions were missing required paperwork. In addition, Dosik complained to Arcuri after Schifano threatened to fire him for refusing to sign off on the inspection checklists for vehicles that were not properly inspected or repaired.

20. In late November or early December 2013, Arcuri and Dosik confronted Schifano together and advised Schifano that what he was doing was wrong and they were unwilling to participate. However, Schifano flatly told them both, "just f*cking do it."

21. Nevertheless, Dosik still refused to sign off on the certification paperwork for vehicles that were not properly inspected or repaired.

22. In addition, Arcuri undertook his own informal investigation to collect evidence to substantiate his and Dosik's belief that Schifano was committing fraud. Arcuri determined that at least twenty-eight (28) used vehicles that were never properly inspected or reconditioned to meet the manufacturer's standards were falsely marketed and sold as CPOs as a result of Schifano's actions.

23. On December 11, 2013, Arcuri, Dosik, and Finance Manager Corie Murphy (who voluntarily resigned shortly thereafter) met with Dunnigan to share their concerns regarding Schifano's discriminatory and unlawful conduct.

24. During the meeting, Arcuri recounted the conversation in which Schifano boasted about not hiring the candidate for the New Car Sales Manager position at Passport Infiniti because he wore a turban. In response, Dunnigan replied, "oh, the turban guy" and laughed.

25. Both Arcuri and Dosik described at length what they knew about Schifano's other unethical and illegal business practices, including the fraudulent CPO scheme. Arcuri gave Dunnigan copies of the documentary evidence that he had gathered, such as the five (5) claim forms Schifano forged and the files for the twenty-eight (28) vehicles that were fraudulently sold

as CPOs. Arcuri and Dosik specifically advised Dunnigan of Schifano's comments to Dosik stating, the "CPO is just a form and a rubber stamp," and, "Don't worry. Nothing will come back on you." In response, Dunnigan said, "sometimes we need to operate in a gray area and we need to do things regarding the incentives and the CPOs. The factory puts us in this position."

26. Arcuri told Dunnigan that he was offended by Dunnigan's suggestion that it was okay to engage in discriminatory hiring practices and unethical and unlawful business practices that defrauded customers, banks and warranty companies and flatly told Dunnigan, "I will not be a party to it. It is illegal."

27. In the days that followed, Dunnigan did nothing to address the concerns Arcuri and Dosik raised regarding Schifano's conduct. In addition, upper management began to ignore Arcuri and Dosik and exclude them from management decisions that they were routinely consulted on or apprised of before they complained about Schifano.

28. Concerned about Dunnigan's inaction and fearing that upper management was retaliating against him for complaining about Schifano's unlawful activities, on December 13, 2013 Arcuri sent Hellmuth an email summarizing what happened at the December 11, 2013 meeting. Arcuri's email described in detail the concerns that he and Dosik raised regarding Schifano's discriminatory and illegal business practices, as well as Dunnigan's lack of response. Shortly thereafter, Dunnigan called Arcuri into his office and screamed at Arcuri for "going above his head." Hellmuth did not respond to Arcuri's email.

29. On December 16, 2013, Dunnigan held a meeting with Arcuri, Dosik, other employees who witnessed Schifano's unlawful conduct and Schifano. At the meeting, Dunnigan indicated that any customers whose signatures Schifano forged would be asked to come in and sign the relevant forms. Arcuri asked if the customers would be told why they were being asked

to come in or that their signatures had been forged, and Dunnigan laughed and responded, "Why would we do that?"

30. Dunnigan also said every victim of the CPO scheme would be contacted and their vehicles would be brought up to standards. Dunnigan asked Arcuri if he was satisfied with Dunnigan's response. Arcuri replied that he was not satisfied because Schifano had "clearly violated company policy" as stated in the employee handbook and "done something illegal," but was not disciplined in any way. Arcuri was aware that when Passport Nissan's former Finance Manager (who is Black) supposedly forged a customer's signature, Dunnigan summarily terminated him.

31. Passport Automotive's senior executives, particularly Hellmuth, have a pattern of making facially discriminatory and/or offensive race-based comments and subjecting Black and White employees to differential treatment based on race, including turning a blind eye when White employees engage in discriminatory and illegal business practices.

32. For example, when the General Manager of Passport Toyota of Marlow Heights ("Passport Toyota") proposed hiring a Black candidate for the position of Used Car Manager, Passport Automotive Vice President and minority shareholder Jay Klein (who is White) responded, "Come on, man! We need a white manager, not another brother working at that store." Klein ultimately gave the Used Car Manager position to a White candidate and the Black candidate was never hired by Passport Toyota or any other Passport Automotive dealership.

33. When Passport Toyota's Service Department was working with a vendor to create a direct marketing mailer, Hellmuth sent Passport Toyota's Service Director and others an email suggesting that they add a picture of the Service Director to the mailer because they "need[ed] a white employee in the picture." At the time, Hellmuth mistakenly believed the Service Director

(who is Black) was White. The Service Director was offended by Hellmuth's comment and complained to Passport Toyota's General Manager, who was also offended by the comment, and the General Manager and Service Director went to Klein together to voice their concerns. However, Klein simply stated, "That's Everett. It's his company." Neither the General Manager nor the Service Director heard anything more from Klein or any other Passport Automotive senior executive regarding their concerns.

34. When Passport Toyota's General Manager informed Hellmuth that a White employee had resigned, Hellmuth responded, "Can we save [him] as we need white guys."

35. When Passport Toyota's General Manager offered a non-standard pay plan to Passport Toyota's Internet Manager (who is Black), Hellmuth rebuked the General Manager and said, "if Passport is going to give a special pay plan to anyone, we should offer it to white salesmen so we can recruit more of them."

36. When Passport Toyota's Service Director proposed offering Service Advisors at Passport Toyota (who are predominantly Black) a pay plan comparable to the pay plans for Service Advisors at Passport Automotive's other dealerships (who are overwhelmingly White), Hellmuth rejected the Service Director's proposal and instead implemented a pay plan that resulted in Passport Toyota's Service Advisors receiving far less compensation than Service Advisors at Passport Automotive's other dealerships. In addition, both Hellmuth and Klein raised baseless concerns that Passport Toyota's Service Advisors were not trustworthy and said, "those people" are "lazy." Further, Hellmuth routinely criticized Passport Toyota's Service Advisors for supposedly delivering inferior service, even though the manufacturer complimented their performance.

37. At the same time, when several employees complained that Passport Toyota's prior General Manager (who is White) was using racial slurs and other pejorative terms, including "nig," "credit roach" and "credit bandit," to refer to Black customers, the complaints were completely ignored. On one occasion, the General Manager told the Service Director, "All these nigs around here just want to buy Lexus and Mercedes from us because they know they can't afford them when they are new." However, no disciplinary action was ever taken against the General Manager with respect to his offensive comments. In fact, it was not until the General Manager's attendance became a major problem that Passport Automotive's senior executives finally replaced him.

38. Passport Automotive's senior executives also disregarded complaints from both employees and customers that Passport Toyota's Finance Manager (who is a White Hispanic) was engaging in discriminatory and unethical business practices. For instance, Passport Toyota's General Manager advised Hellmuth and Klein that the Finance Manager was charging Black customers higher interest rates, making false or misleading statements to convince Black customers who had too much negative equity in their trade-ins to purchase new vehicles and allow their trade-ins to be repossessed, and attempting to convince Black customers that their credit was not good enough to receive the interest rates they were initially quoted and that they had to either purchase a warranty to obtain the quoted interest rate or pay a higher rate. However, the Finance Manager was never disciplined in any way.

39. In any event, after Arcuri and Dosik attended the December 16, 2013 meeting with Dunnigan, Arcuri sent Hellmuth an email summarizing what happened at the meeting. In that email, Arcuri expressly complained that Passport Automotive's senior executives were treating Schifano differently and more favorably than the Black Finance Manager who

committed comparable but far less serious misconduct. Arcuri also stated that he felt he had been targeted for bringing these issues to light. Once again, Hellmuth did not respond.

40. A few days later, Arcuri ran into Hellmuth and for the first time Hellmuth acknowledged Arcuri's emails and scheduled a meeting with Arcuri.

41. At Arcuri's meeting with Hellmuth, Hellmuth did not meaningfully address any of the concerns that had been raised about Schifano's activities, Dunnigan's response, and/or apparent retaliation by upper management. Instead, Hellmuth simply noted that Schifano "has a family" and asked Arcuri, "what should I do?" When Arcuri pointed out that the employee handbook provided for employees who engaged in such egregious misconduct to be terminated, Hellmuth basically threatened Arcuri's job by reminding him that Passport Infiniti's former General Manager (Schifano's predecessor) had been terminated a few months earlier, saying, "Maybe we made the wrong decision in keeping you."

42. A few days after the meeting between Arcuri and Hellmuth, employees at Passport Infiniti were notified that Schifano would no longer serve as Passport Infiniti's General Manager. However, the management team continued to copy Schifano on all emails related to Passport Infiniti. Further, Schifano still retained his role as Passport Nissan's General Manager.

43. In the months that followed, both Arcuri and Dosik were subjected to various forms of retaliation by upper management, including, but not limited to, being ignored and excluded from management decisions and having the terms of their compensation unilaterally changed without any advance notice. For example, in or around June 2014, Arcuri learned that upper management had unilaterally decided that he would no longer receive a percentage of "holdback" money, which is a form of compensation that he had received in every year prior to complaining about Schifano. As a result, Arcuri's income during the first six (6) months of 2014

decreased by approximately $32,000.00. Upper management further retaliated against Arcuri by changing his schedule and increasing his hours of work and increasing his workload by leaving vacant positions open.

44. The retaliation culminated in Arcuri and Dosik being abruptly and summarily terminated exactly three (3) weeks apart after having diligently worked for Passport Automotive dealerships a combined total of more than thirty (30) years.

45. Dunnigan informed Dosik that his employment was being terminated on or about July 10, 2014. Dunnigan did not explain why Dosik's employment was being terminated.

46. Prior to Dosik's termination, Dosik had served as Passport Infiniti's Service Director for approximately six (6) years and had a track record of solid performance. In fact, the main performance objective upper management had established for Dosik in 2014 was to improve the Service Department's Customer Service Index or "CSI" rating, which Dosik clearly met or exceeded as the Service Department had received the highest CSI rating, i.e. Tier 1, all year.

47. Dunnigan notified Arcuri that his employment was being terminated three (3) weeks later on August 1, 2014. Dunnigan did not explain why Arcuri's employment was being terminated either.

48. Prior to Arcuri's termination, Arcuri had served as Passport Infiniti's General Sales Manager for approximately four (4) years and also had a track record of solid performance. Indeed, when Dunnigan informed Arcuri that he was being terminated, Dunnigan specifically acknowledged that Arcuri had performed well and expressly mentioned that Arcuri had been #1 in sales for the region for the month of July 2014.

49. Shortly before Arcuri was terminated, Arcuri reviewed the files for the twenty-eight (28) vehicles that were fraudulently sold as CPOs and discovered none of the vehicles had been properly inspected or repaired since the December 16, 2013 meeting when Dunnigan claimed the vehicles would be brought up to the manufacturer's standards.

50. The day after Arcuri's employment was terminated, employees at Passport Infiniti were notified that Schifano would resume the role of General Manager at Passport Infiniti.

51. Passport Automotive's senior executives, including Hellmuth, have a pattern of retaliating against employees who oppose unlawful business practices. For example, after Passport Toyota's General Manager and Service Director objected to their colleague's discriminatory and illegal business practices, upper management began to scrutinize their performance and criticize them for petty or manufactured reasons. The Service Director was further retaliated against by having his demo car taken away, being excluded from meetings and having his decisions second-guessed. Ultimately, within a few months of complaining about Hellmuth's statement that they "need[ed] a white employee" in the direct marketing mailer, both the General Manager and Service Director's positions were advertised in the Washington Post and the General Manager was terminated and the Service Director was demoted within a few weeks of each other.

## COUNT I

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

52. Plaintiffs re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

53. Defendants' conduct as described herein constitutes unlawful retaliation in violation of Section 1981.

54. Defendants' discriminatory employment practices, including, but not limited to, refusing to hire a man who appeared to be Middle Eastern or East Asian solely because he wore a turban and treating Caucasian employees differently and more favorably than African-American employees who engaged in less egregious misconduct, constituted intentional discrimination on the basis of race with respect to the making, performance, modification and/or termination of contracts and the benefits, privileges, terms, and conditions of the contractual relationship in violation of Section 1981.

55. Plaintiffs engaged in protected activity by complaining about Defendants' discriminatory employment practices.

56. Thereafter, Defendants subjected Plaintiffs to numerous adverse employment actions, including, but not limited to, ignoring Plaintiffs and excluding them from management decisions, unilaterally changing the terms of Plaintiffs' compensation without any advance notice, and, ultimately, terminating Plaintiffs' employment. These adverse actions were causally connected to Plaintiffs' protected activity.

57. As a direct and proximate result of Defendants' retaliatory acts, Plaintiffs have suffered compensatory damages, including, but not limited to, back pay for lost wages, salary, commissions, fringe benefits and any other remuneration Plaintiffs would have earned during the period of retaliation through trial, front pay, future pecuniary losses, and damages for emotional distress, pain and suffering, inconvenience, mental anguish, humiliation, disgrace, loss of dignity and loss of enjoyment of life; punitive damages; pre-judgment and post-judgment interest; attorney's fees, costs and expenses.

## COUNT II

## WRONGFUL DISCHARGE IN VIOLATION OF VIRGINIA PUBLIC POLICY

58. Plaintiffs re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

59. Plaintiffs were employed by Passport Infiniti on an at-will basis.

60. Plaintiffs at all times fully and competently performed all of the duties assigned to them.

61. Plaintiffs discovered that Defendant Schifano was committing fraud by falsely marketing and selling used vehicles that were never properly inspected or reconditioned to meet the manufacturer's standards as certified pre-owned vehicles.

62. When Plaintiffs objected to Schifano's unethical and fraudulent business practices, Schifano instructed them to perform acts to facilitate the fraud.

63. Plaintiffs refused to participate in Schifano's fraudulent CPO scheme and reported his activities to Defendants Dunnigan and Hellmuth.

64. Thereafter, Defendants subjected Plaintiffs to numerous adverse employment actions, which culminated in the termination of Plaintiffs' employment.

65. Plaintiffs' discharge was wrongful and in violation of Virginia public policy to the extent that it resulted from Plaintiffs' rightful refusal to engage in a criminal act.

66. The avowed public policy of the Commonwealth of Virginia is violated when an employer discharges an employee based on the employee's refusal to engage in a criminal act.

67. By instructing Plaintiffs to perform acts to facilitate the fraudulent CPO scheme, Schifano directed Plaintiffs to engage in a criminal act. Specifically, Schifano directed Plaintiffs to engage in conduct that violates Virginia criminal statutes prohibiting fraud, including, but not limited to, Virginia Code §§ 18.2-172 (prohibiting obtaining another person's signature to any

forged writing by any false pretense with intent to defraud any other person), 18.2-178 (prohibiting obtaining money from another person by any false pretense with intent to defraud), 18.2-209 (prohibiting false publications), 18.2-216 (prohibiting deceptive or misleading advertising, inducements, writings or documents), and 18.2-217 (prohibiting advertising merchandise for sale with the intent not to sell on the terms advertised).

68. Defendants' conduct in wrongfully discharging Plaintiffs was deliberate, malicious, willful, and intentionally calculated to inflict harm on Plaintiffs.

69. As a direct and proximate result of Defendants' wrongfully discharging Plaintiffs, Plaintiffs have suffered compensatory damages, including, but not limited to, back pay for lost wages, salary, commissions, fringe benefits and any other remuneration Plaintiffs would have earned during the period of retaliation through trial, front pay, future pecuniary losses, and damages for emotional distress, pain and suffering, inconvenience, mental anguish, humiliation, disgrace, loss of dignity and loss of enjoyment of life; punitive damages; pre-judgment and post-judgment interest; attorney's fees, costs and expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for this Court to enter a judgment against Defendants finding that Defendants are liable to Plaintiffs and awarding Plaintiffs the following relief:

A. A declaratory judgment that Defendants' discriminatory and retaliatory practices as described herein are unlawful and violate Section 1981;

B. A permanent injunction against Defendants and their agents, employees and/or representatives, and any and all persons acting in concert with them, prohibiting them from engaging in any further discriminatory and retaliatory practices as set forth herein;

C. An award of compensatory damages, including, but not limited to, back pay for lost wages, salary, commissions, fringe benefits and any other remuneration Plaintiffs would have earned during the period of retaliation through trial, front pay, and future pecuniary losses, damages for emotional distress, pain and suffering, inconvenience, mental anguish, humiliation, disgrace, loss of dignity and loss of enjoyment of life, and punitive damages in an amount to be determined at trial; pre-judgment and/or post-judgment interest; attorney's fees, costs and expenses; and any other relief the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

Respectfully submitted,

Jay M. McDannell (Va. Bar No. 45630)
jmcdannell@berliklaw.com
BERLIKLAW, LLC
1818 Library Street, Suite 500
Reston, VA 20190
Telephone: (703) 718-0171
Fax: (888) 772-0161

and

A. Donald C. Discepolo
don@discepolollp.com
Tonya Baña
tonya@discepolollp.com
DISCEPOLO LLP
111 S. Calvert Street, Suite 1950
Baltimore, MD 21202
Telephone: (410) 296-0780
Fax: (410) 296-2263
*Attorneys for Plaintiffs*

Dated: October 21, 2014